## LOWE v. UNITED STATES.
### No. 4766.

United States District Court
W. D. Missouri, W. D.
March 17, 1949.

Kemp, Koontz, Clagett & Norquist, of Kansas City, Mo., for plaintiff.

Sam A. Wear, U. S. Atty. and Thomas A. Costolow, Asst. U. S. Atty., both of Kansas City, Mo., for defendant.

DUNCAN, District Judge.

Plaintiff instituted this action under the Federal Tort Claims Act, 28 U.S.C.A. § 921 et seq. [now §§ 1346, 2671 et seq.], to recover damages for personal injuries resulting from his being struck by an automobile owned by the United States and operated by one of its employees, on the 23rd day of January, 1946.

Plaintiff was walking along the south side of Ninth Street, from the west side of Baltimore Avenue to the east side. Baltimore Avenue and Ninth Street are intersecting public streets in Kansas City, Missouri. Plaintiff was in the pedestrian lane, and had reached the center of Baltimore Avenue, or possibly slightly beyond the center, when he was hit by defendant's car, receiving injuries which will be detailed later.

Plaintiff, a sixty year old carpenter, had been to lunch and at the time of his injury was on his way to a hardware store some blocks away, to obtain certain materials to be used in his work.

The car was a Ford Sedan, assigned to the War Department, and bearing upon its body the name of that department, definitely designating it as the property of the United States. It was used for transporting personnel, military and civilian, between hotels in downtown Kansas City, Missouri, and the Fairfax Air Base in Kansas City, Kansas.

Jack W. Beck, a civilian civil service employee, was operating the car. He usually operated a bus, but on this day, sometime before noon, he had taken several Army officers from the Fairfax Air Base

to the Bellerive Hotel and to the Ambassador Hotel in the car. After discharging his passengers he was stopped by another Army officer, who was not connected with the Fairfax Air Base. This officer asked Beck to take him to another address, a considerable distance from his accustomed route. Beck called the "motor pool" at the Air Base for instructions, and was told to make the "hotel run", which meant driving to various downtown hotels to pick up such persons as might desire to be transported to the Fairfax Air Base.

After discharging this last officer, Beck was in the neighborhood of the residence of his "girl friend" and decided to make a call upon her before again taking up his route. She was busy and he spent but a few minutes with her. Her residence and the place where he roomed were close together and he decided to go by his room and get some money he had left on his dresser. Upon arriving there he found his landlady and her son, Newton Wall, preparing to come downtown. Beck said he was coming downtown and invited them to ride with him. This was in violation of regulations.

He proceeded to the downtown area by driving west on Fifteenth Street to Main Street, then north on Main Street to the north side of Twelfth Street, where he let Mrs. Wall out. He and Newton Wall then proceeded north on Main Street to Ninth Street, west on Ninth Street to either Baltimore Avenue or Wyandotte Street (which is a block west of Baltimore Avenue) and turned left, where the plaintiff was struck.

Defendant contends that its driver had deviated from his route and was not at the time of the accident in the performance of the duties for which he was employed. Unquestionably, the driver had deviated from his route by going to call on his "girl friend" and by calling at his own residence, both of which were far removed from the usual route he followed, i.e., from the downtown hotels to Fairfax Air Base. The Muehlebach Hotel, the Phillips Hotel, and four other hotels are on Baltimore in the vicinity of 12th and 13th Streets. Baltimore is two blocks west of Main. Another hotel, the Westgate, now the Kay Hotel, was located at 9th and Main. The

driver said he was on his way to see if any passengers were at the Westgate, which accounts for his going north on Main Street. At the time he turned south off of Ninth Street, he was on his way to the Muehlebach Hotel.

Although he had deviated from the course of his employment, at the time of the injury he was in the immediate vicinity of the hotels where he was accustomed to pick up passengers, and I think that he had unquestionably returned to the performance of his duties, thus rendering the defendant liable for his negligent acts.

Plaintiff is stone deaf and it was necessary to write the questions to be propounded to him at the trial on a sheet of paper. He is also blind in his left eye, having had that eyeball removed 10 or 12 years ago. However, these disabilities in no wise contributed to the causing of his injuries.

Plaintiff testifies, and I am convinced of its truth, that he saw the car as he left the curb on the west side of Baltimore Avenue; that it was then 50 or 75 feet away, headed west on Ninth Street; that he then looked to the south, or to his right, to see if anything approached from that direction; that when he turned back, he could almost put his hand on the car; and, that at that time he was 4, 5 or 6 feet from the east curb of Baltimore Avenue.

Newton Wall, who was with Beck, says that he first saw the plaintiff when the car was 20 or 25 feet away from him, and that plaintiff was just stepping off of the west curb; that the car was moving 2 or 3 miles per hour; that Beck stopped, both he and the plaintiff waiting for each other; that plaintiff got out about to the middle of the street and was hit; that the car was moving 15 or 20 miles per hour when plaintiff was hit; that the car stopped immediately after hitting plaintiff; and, that plaintiff was about 3 or 4 feet in front of the car following the accident.

The driver, Beck, says he first saw plaintiff when he was leaving the west curb of Baltimore Avenue; that the car was about in the middle of Ninth Street and in the east lane of Baltimore Avenue, where it crosses Ninth Street; that it was "drizzling"; that when he had almost made the

turn, his wheels began to spin; that the car came to a full stop when the wheels spun; that he "gunned it" until the wheels were turning at the rate of 20 miles an hour and that the car then "lunged" forward, the right front of the car striking plaintiff at about the middle of the street; that the car stopped immediately; and, that the rear wheels were 3 or 4 feet from the southeast corner of the street, which would place the entire car in the left-hand, or east, lane of Baltimore Avenue.

■ It was the duty of the operator of the car to operate it in a careful and prudent manner, and to exercise the highest degree of care. See Revised Statutes, Missouri 1939, Section 8383, 18 Mo.R.S.A. § 8383. This he did not do. He failed to keep his car under proper control. He saw, or by the exercise of the highest degree of care should have seen, plaintiff in a position of imminent peril of being struck, in time to have stopped or to have turned the car with safety to its occupants. With the facilities at hand, he could have, or should have, avoided striking the plaintiff. Due care required him to go to the right of the center of the intersection before turning, in accordance with Ordinance 7100, Section 11-50 of the Traffic Code of Kansas City, Missouri, which states in part: "The driver of a vehicle intending to turn at any intersection or driveway shall do so as follows, * * *: Approach for a left turn shall be made in the lane for traffic to the right of and nearest to the center line of the roadway, and the left turn shall be made by passing to the right of such center line where it enters the intersection and upon leaving the intersection by passing to the right of the center line of the roadway then entered."

Defendant's driver was negligent in that he "cut the corner" and turned into Baltimore Avenue on the left side thereof. As a result of such negligence, plaintiff was injured.

Defendant plead contributory negligence, but has failed to sustain the plea. There is no evidence to show that the plaintiff was not exercising ordinary care for his own safety. He was injured as a result of defendant's negligence, and is entitled to recover. The amount to which he is entitled presents a more troublesome problem.

After striking the plaintiff, the car stopped almost instantly and the driver and the witness Wall got out and helped him up. They placed him in the car and took him to an Army dispensary a short distance away. He was taken out of the car and into the dispensary where it was determined that he was not eligible for treatment. He was then placed back in the car, and under police escort, taken to General Hospital in Kansas City, Missouri, where he received aid.

The plateau of the tibia of the left leg (just below the knee) was broken. He had a severe cut on his head, which required five stitches to close. His right leg was injured, but not severely. He later complained of injury to his back. A removable cast was applied to the left leg and he was required to wear it for 9 or 10 weeks.

Plaintiff was injured about noon, and about 9 o'clock that night was taken to his home. Crutches were provided for him and on the third day he returned to the hospital for further treatment. Thereafter, he frequently went to a Dr. Shoens' office for treatment. He completely recovered from the head injury and the injuries to his right leg. He returned to work June 10, 1946, five and one-half months after his injury.

Plaintiff claims permanent injury to his knee and to his back. He says that his back did not hurt him at the time of the injury but that it has since, and still does, hurt him, although it does not interfere with his movements. It had never bothered him before. He says, "It is sore and stays with me."

There is no limitation of movement in the left knee joint, but the function of the knee is impaired as a result of atrophy of the quadriceps muscle of the left thigh, which controls the knee. The knee is thus weakened considerably. The left thigh is ¾ of an inch smaller than the right thigh. As a result of this atrophy, the plaintiff says he is not able to climb or kneel, thus impairing his usefulness as a carpenter.

Dr. Piccard, an orthopaedic surgeon, examined plaintiff and testified on his behalf.

This examination was made in May, 1948, at which time X-ray pictures were taken of the left knee and of the back. Dr. Piccard says that his left knee is impaired to the extent of 40%, but that "with use, instability now found in the knee could be made less." Dr. Piccard also says that the X-ray pictures which he had taken show a mild compression fracture of the 11th and 12th dorsal vertebrae and that as a result of such condition he is permanently disabled to the extent of 15 or 20 percent. This is in addition to the knee injury.

At the request of the defendant, Dr. George A. White, an orthopaedic surgeon from Kansas City, Missouri, was appointed to examine the plaintiff. His examination was also made in May, 1948, and he also had X-ray pictures taken at the time of his examination.

As to the knee injury and its degree of permanency, there is little dispute between Dr. Piccard and Dr. White. Dr. White said, " * * * on examination of the thighs, there was found to be considerable atrophy of the left quadriceps muscle, as compared with the right thigh." The left thigh measured 17 inches in circumference, while the right thigh measured 17 and ¾ inches. Dr. White also testified that plaintiff's complaint of "a giving way of the knee joint" was to be explained by the moderate degree of quadriceps atrophy in the left thigh. He found no impairment of the knee itself and no limitation of movement of the knee joint. He found evidence of a fracture of the "lateral tibial condyle", just below the left knee.

Dr. White did not find evidence of a compression fracture of the dorsal vertebrae. He found "a minimal degree of osteoarthritis with bony spur formation on the anterior margins of the lower lumbar and lower dorsal vertebrae." As a result of the injury to the back, Dr. White found a "slight to moderate" degree of disability. There is little dispute between the physicians as to the degree of total disability—20 to 35 percent.

Plaintiff has worked for the same contractor most of the time for 30 years. He was at one time a superintendent, but because of the loss of his hearing, he was required to give up that position and work as a carpenter.

The doctors say that most persons past middle life suffer from arthritis. Plaintiff has done hard work most of his life, and the strain and wear and tear on his joints has been severe. One physician said it is impossible to distinguish between the arthritic condition which already existed and that which was contributed by the injury. It is agreed that he has an injury to his back; a condition that is permanent. Whether the condition is one aggravated by the injury or one that was caused by the injury does not change the seriousness of it.

At the time of his injury, plaintiff was earning $1.57½ per hour. Before he returned to work, the rate was increased to $1.75 per hour, and he now receives $2.05 per hour, the present union scale for carpenters. Plaintiff estimates his actual loss in dollars through loss of time from January 23, 1946, to June 10, 1946, as $1,300. I am sure that he lost at least $1,200.

Although the doctors say he is 25 percent, or more, disabled, plaintiff says he has not lost more than 5% of his work time as a result of his injury, and that that loss was because he could not do certain types of work involving climbing and kneeling. He was required to wait until certain types of work which he could do became available.

 The Court may take notice of what is common knowledge. Building has been extensive. Carpenters have been in demand; in fact, anyone who could "do the job" has been in demand. This condition (not to be pessimistic) may not continue indefinitely, or all during the plaintiff's working life. He is 60 years old now. As he naturally slows up, his services will become less valuable. If that natural slowing up is hastened or greatly increased by his injury, he will undoubtedly suffer a much greater loss of earning power than under normal conditions.

 Considering his actual loss of earnings, his permanent injury, his pain and suffering, and all of the other circumstances, I think $4,500 will be a fair amount of compensation. The Act provides that

the Court may allow an attorney's fee of not to exceed 20%. That is considerably less than is usually charged in personal injury litigation. The attorneys for plaintiff are therefore allowed $900 to be paid by plaintiff.

The parties may submit findings of fact and conclusions of law and judgment, in accordance with this opinion.